**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL CASE NO. 5:26-cv-00056-FDW**

| | | |
|---|---|---|
| **ERIC CHRISTOPHER ORR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| **DEAN WALSH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment [Doc. 87] and Defendants' Motion to Seal [Doc. 90].

## I. PROCEDURAL BACKGROUND

Pro se Plaintiff Eric Christopher Orr ("Plaintiff") is a prisoner of the State of North Carolina currently incarcerated at Marion Correctional Institution in Marion, North Carolina. He filed this action on June 17, 2024, in the United States District Court for the Eastern District of North Carolina, seeking relief for three alleged use of excessive force incidents which occurred in September and October 2023 at Alexander Correctional Institution ("Alexander") in Taylorsville, North Carolina. [Case No. 5:24-ct-03154-BO-RJ (E.D.N.C.), Doc. 1].

On December 23, 2025, after Plaintiff amended his Complaint in that action, the Court allowed Plaintiff's excessive force-related claims against Defendants Dean Walsh, Chandler Sculley, Joey Jamison-Lafond, Travis Delozier, David Carroll, Thomas Franklin, Jordan Campbell, Pat Daniels,[1] Keven Greene, Lester Torres, Matthew Lay, Adam Herald, Tyler Allen,

[1] The Plaintiff did not name Pat Daniels as a Defendant in his original or Amended Complaint [see Doc. 1 at 1, 3-7; Doc. 55 at 1, 3-8], nor did he assert any allegations against him that support a claim for relief

Justin Franks, and Kaij Emig to proceed, as well as a First Amendment retaliation claim against Defendants Greene, Campbell, Torres, Delozier, Lay, and Herald related to the October 6, 2026 use of force, to pass initial review.[2] [Id., Docs. 55, 59]. The Court dismissed Plaintiff's remaining claims and the remaining Defendants. [Id., id. at 7, 10]. Defendants answered Plaintiff's Amended Complaint. [Id., Docs. 64, 75].

On March 10, 2026, Judge Boyle transferred this matter to the Western District, noting that Plaintiff's cause of action arose at Alexander, which is located in the Western District, and that the Court's clerical error in finding that the events occurred at Tabor CI could be corrected pursuant to Fed. R. Civ. P. 60(a) at any time before an appeal is docketed in the appellate court. [Id., Doc. 76 at 2, n.1 (citing Doc. 59 at 9)].

Defendants moved for summary judgment. [Doc. 87]. As grounds, Defendants argue that the Eleventh Amendment bars Plaintiff official capacities claims,[3] that Defendants did not violate Plaintiff's constitutional rights, and that Defendants are entitled to qualified immunity in any event. [Doc. 88 at 13-14, 16-25]. In support of their motion, Defendants submit a Memorandum; the Plaintiff's North Carolina Department of Adult Correction (NCDAC) Incarceration Summary, Custody and Control History, and Infraction Summary; Incident Reports and video footage from

---

under the Eighth Amendment or otherwise. Rather, Plaintiff alleged only that Defendant Lay sprayed pepper spray in Plaintiff's cell "[t]hat wasn't suppose to be used per the Associate Warden Mr. Daniels." [Doc. 55 at 12]. Because the inclusion of Associate Warden Daniels among the Defendants passing initial review of Plaintiff's Amended Complaint appears to have been a transcription error, the Court dismissed him as a Defendant pursuant to Rule 60(a). [Doc. 82].

[2] The Court, however, mistakenly found that these events occurred at Tabor Correctional Institution ("Tabor CI"), not Alexander as alleged. [Case No. 5:24-ct-03154-BO-RJ, Doc. 59 at 9].

[3] Plaintiff's official capacity claims should have been dismissed on initial review as barred by the Eleventh Amendment and, therefore, for Plaintiff's failure to state a claim for relief. [See Docs. 55, 59]. Because they were not, the Court dismisses them here for the same reasons and declines to address them further. See Ballenger v. Owens, 352 F.3d 842, 844-45 (4th Cir. 2003).

the three incidents;[4] Plaintiff's September 26, 2023 Disciplinary Infraction; the NCDAC Use of Force Policy; Declarations of all Defendants,[5] Alexander Warden Ben Anderson, and NCDAC Medical Record Custodian Amy LaRosa; and select medical records of the Plaintiff. [Docs. 89, 89-1 through 89-26]. Defendants also move to seal certain of these exhibits. [Doc. 90].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 94]. In opposition to Defendants' motion, Plaintiff filed a brief and his own Declaration.[6] [Docs. 97, 97-3]. Defendants did not file a reply. [See Doc. 98].

This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

---

[4] The Court cites the video footage in accordance with Defendants' labeling of the submitted footage. For instance, the Court will cite to footage from September 27, 2023 in the Green North Housing Unit as "Video 1Fa."

[5] It appears from the Declarations of the Defendants that Defendant Greene's last name is spelled "Green." [Doc. 89-25: Green Dec.]. The Court will instruct the Clerk to update the docket accordingly.

[6] Previously, Plaintiff submitted a motion for relief from judgment, which he verified was "accurate to the best of [his] knowledge, information, and belief." [Doc. 80 at 10]. To the extent such a filing could otherwise be considered part of Plaintiff's evidentiary forecast on summary judgment, an affirmation on information and belief is insufficient to support the denial of summary judgment. See Cotton v. Town of Seven Devils, 30 Fed. App'x 230, 234 (4th Cir. 2002) (statements based solely on information and belief do not satisfy the requirements of Rule 56; conclusory affidavits are insufficient to survive a summary judgment motion). Moreover, even if the Court considered the statements in this pleading, the outcome would be the same.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat

> an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380. Moreover, "at the summary judgment stage, video evidence can only discredit a nonmovant's factual assertions if the video 'blatantly' contradicts the nonmovant's position." Simmons v. Whitaker, 106 F.4th 379, 385 (4th Cir. 2024) (citing Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008)).

## III. FACTUAL BACKGROUND

The relevant forecast of evidence, in the light most favorable to the non-movant, shows the following.[7]

Plaintiff was convicted of various state charges in 2016 and 2017, including being a habitual felon, common law robbery, speeding to elude arrest, and assaulting an officer. [Doc. 89-2 at 1-3]. Since August 2017, while is state custody, Plaintiff has been convicted of at least 40 infractions, including 14 charges of disobeying orders and eight charges of fighting or threatening or assaulting staff. [Doc. 89-4].

During September and October 2023, Defendants were all employed by the NCDAC and working at Alexander. Defendants Sculley, Jamison-Lafond, Carroll, Campbell, Franklin, Franks, Allen, Lay, Torres, Green, Delozier, and Herald were Correctional Officers. [Doc. 89-14 at ¶ 2:

[7] In this regard, the Court notes that Plaintiff makes various unsubstantiated and patently unreasonable averments in his Declaration that are so contrary to the record and video evidence that the Court disregards them. For instance, Plaintiff repeatedly claims Defendants engaged in conduct "for no reason," while the video and/or record evidence plainly contradicts these claims. Additionally, Plaintiff often significantly and materially exaggerates or mischaracterizes the Defendants' conduct and minimizes his own. The Court, however, presents Plaintiff's version, even where discredited, as appropriate.

Sculley Dec.; Doc. 89-15 at ¶ 2: Jamison-Lafond Dec.; Doc. 89-16 at ¶ 2: Carroll Dec.; Doc. 89-17 at ¶ 2: Campbell Dec.; Doc. 89-20 at ¶ 2: Franklin Dec.; Doc. 89-21 at ¶ 2: Franks Dec.; Doc. 89-18 at ¶ 2: Allen Dec.; Doc. 89-22 at ¶ 2: Lay Dec.; Doc. 89-23 at ¶ 2: Torres Dec.; Doc. 89-25 at ¶ 2: Green Dec.; Doc. 89-26 at ¶ 2: Delozier Dec.; Doc. 89-24 at ¶ 2: Herald Dec.]. Defendants Walsh and Emig were Correctional Sergeants. [Doc. 89-13 at ¶ 2: Walsh Dec.; Doc. 89-19 at ¶ 2: Emig Dec.].

**A. September 27, 2023 Incident**

On September 27, 2023, Plaintiff was instructed to come to Defendant Walsh's office to sign documents related to a disciplinary infraction for Plaintiff's unauthorized use of his tablet the day before. [Doc. 89-13 at ¶ 7; Doc. 89-14 at ¶ 7; see Doc. 91-1 at 1-2]. While in the office, Plaintiff asked if the tablet that was on Defendant Walsh's desk was Plaintiff's confiscated tablet. Defendant Walsh confirmed that it was. [Id. at ¶ 8; Doc. 89-14 at ¶ 8]. When Plaintiff left the office, he took the tablet without the knowledge or authorization of the officers in the room, including Defendants Walsh, Sculley, and Jamison-Lafond. [Id.; Doc. 89-14 at ¶ 8; Doc. 89-15 at ¶ 8].

After noticing the tablet was missing, these Defendants went to Plaintiff's cell on the upper level of Green Unit to retrieve the tablet and escort him to Restrictive Housing, also known as Red Unit. [Id.; Doc. 89-14 at ¶ 8]. Defendant Walsh arrived at Plaintiff's cell first with Defendants Sculley and Jamison-Lafond close behind. Defendant Walsh had Plaintiff's cell door unlocked and directed Plaintiff to hand over the tablet. Plaintiff handed Walsh the tablet. When Defendant Walsh directed Plaintiff to exit the cell and submit to restraints, Plaintiff became aggressive. [Id. at ¶ 9; Doc. 89-14 at ¶ 9]. Unfortunately, the inside of Plaintiff's cell is not captured in the footage. Defendants' evidence shows that, after multiple orders to exit his cell, Plaintiff began cursing,

threatening the Defendants who were present, and posturing himself aggressively. [Doc. 89-13 at ¶ 9; Doc. 89-14 at ¶ 9]. Although the inside of Plaintiff's cell cannot be visualized, the video evidence shows Defendant Walsh speaking and gesturing for Plaintiff to exit the cell after Plaintiff handed over the tablet. The video shows Defendant Sculley, who is also speaking to the Plaintiff and similarly gesturing, behind Defendant Walsh. [Video 1Fb]. While Plaintiff denies acting aggressively, he admits that Defendant Walsh ordered him to submit to restraints. [Doc. 97-3 at 2]. After nearly 20 seconds of this exchange, whether in response to Plaintiff's aggressive behavior and/or after Plaintiff failed repeatedly to comply with orders to submit to restraints, Defendant Sculley stepped forward and deployed a short, approximately 1.5-second burst of pepper spray into the Plaintiff's cell directed at his face. [Doc. 89-14 at ¶ 9; Videos 1Fa, 1Fb]. After another 40 seconds of Defendants Sculley and Walsh apparently trying to coax the Plaintiff out of his cell, Defendant Walsh drew his taser and pointed it toward the Plaintiff. [Videos 1Fa, 1Fb]. Plaintiff finally slowly emerged from his cell. [Doc. 89-14 at ¶ 10; Video 1Fa].

Defendant Sculley was able to handcuff the Plaintiff without incident and Defendants Sculley, Walsh, and Jamison-Lafond began to escort him to the decontamination shower.[8] [Video 1Fa; Doc. 89-13 at ¶ 10]. Plaintiff, however, quickly became combative and resistive. [Id.; see Doc. 89-14 at ¶ 10]. Defendant Walsh held Plaintiff's left arm and Defendant Sculley held his right arm while gripping Plaintiff's restrained wrists, as they both led Plaintiff down the stairs out of the Green North Housing Unit with Defendant Jamison-Lafond following behind. [Video 1Fa]. While walking down the stairs, Plaintiff leaned forward and persistently resisted forward movement. [Doc. 89-13 at ¶ 10; Doc. 89-14 at ¶ 10; Video 1Fa]. Once Plaintiff and these

[8] Plaintiff claims that he "rushed out of [his] cell nervous" and that Defendant Scully placed the handcuffs "extra tight twisting and bending [Plaintiff's] arms … [l]ike he was trying to brake [*sic*] them." [Doc. 97-3 at 2]. The video evidence directly contradicts these claims.

Defendants reached the bottom of the stairs, Plaintiff continued to resist, leaning forward and forcing the officers to pull him along. [Video 1Fa; Doc. 89-13 at ¶ 10; Doc. 89-14 at ¶ 10].

Defendants Sculley, Walsh, and Jamison-Lafond continued to escort Plaintiff to Red Unit, walking through the Green Unit control room and Green Housing South. Before reaching the Green Unit elevator sallyport, Defendant Jamison-Lafond disengaged from the escort. [Videos 1Fc, 1Fd]. Throughout these movements, Plaintiff was resistive, jerked away from the Defendants Sculley and Walsh, and leaned toward the ground.[9] [Videos 1Fc, 1Fd, 1Fe; Doc. 89-13 at ¶ 10; Doc. 89-14 at ¶ 10; Doc. 89-15 at ¶ 10].

On entering the elevator in the Green Unit sallyport, Defendants Sculley and Walsh immediately placed Plaintiff against the far elevator wall. Plaintiff resisted by pulling his head towards the ground. Sculley and Walsh firmed their hold and position in response.[10] [Video 1Ff; Doc. 89-14 at ¶ 10]. Before the elevator door opened, Plaintiff became increasingly combative and resistive. [Id.].

When the elevator arrived at Blue Unit, other officers were present to assist. After Defendants Sculley and Walsh struggled to get Plaintiff out of the elevator, they, along with the

---

[9] Plaintiff claims that, at some point during the escort before getting on the elevator, he "was thr[own] on the floor[ ] and picked back up by the handcuffs." [Doc. 97-3 at 2]. The video evidence, which captures the entirety of the escort from the Green Unit to the Red Unit, directly refutes this. At no point during this escort does any Defendant throw Plaintiff to the floor or pick him back up by the handcuffs. Moreover, Plaintiff does not allege which Defendant or Defendants were responsible for this alleged, though discredited, conduct, in any event.

[10] Plaintiff contends that Defendants Walsh and Sculley "smashed [his] face into the wall, still bending [his] arms like they were trying to brake [*sic*] them." [Doc. 97-3 at 2]. Again, the video evidence contradicts this claim. Defendants Sculley and Walsh secured Plaintiff against the elevator wall in response to his resistive and combative behavior. To the extent Plaintiff's arms were bent or held in an uncomfortable position, Plaintiff's behavior in resisting movement and leaning and pulling himself forward caused this condition.

other officers now present, immediately put Plaintiff against a wall to regain his compliance.[11] [Video 1Fg]. Once Plaintiff abandoned his resistance, the officers continued the escort to Red Unit. [Videos 1Fg, 1Fh]. The group traveled from the Blue Unit sallyport through the Blue Unit hallway to Central and the Central control room then down an Education Hall to the Red Unit. [Videos 1Fg, Extra Footage C77, C78, C84, C87, C 141, C143].

On arriving at lower Red Unit, Defendants Carroll and Campbell took over the escort and Defendants Sculley and Walsh were relieved. [Doc. 91-2 at 1; see Videos 1Fh, 1Fi; Doc. 89-13 at ¶ 11; Doc. 89-14 at ¶ 11]. On entering the Red Unit control room area, Plaintiff initially appears to be standing upright and compliant. [Video 1Fi]. At the entrance of the Red Unit, however, while escorted by Defendants Campbell and Caroll, Plaintiff tripped or attempted to jerk away. The video suggests that Plaintiff may have caused himself to fall to the ground, likely due to his pants sagging substantially and his right pant leg covering his shoe, perhaps together with an attempt to pull away.[12] [Video 1Fk].

Regardless, as Plaintiff fell, Defendants Carroll and Campbell went down with him and quickly sought to gain control and Plaintiff's compliance. [Videos 1Fi, 1Fk; Doc. 89-16 at ¶ 8; Doc. 97-3 at 2; Doc. 91-2 at 1]. One of them pinned Plaintiff on the ground while the other, who was at Plaintiff's head, assisted in gaining control of the Plaintiff. Another officer, possibly Defendant Delozier, knelt to assist and then a fourth officer, presumably Defendant Emig, joined

---

[11] Here, Plaintiff contends, contrary to the video evidence, that Defendants Walsh and Sculley "r[a]n [Plaintiff's] head into the wall" when they got off the elevator and that Plaintiff "still wasn't being aggressive." [Doc. 97-3 at 2].

[12] Plaintiff claims that Defendants Campbell and Carroll "tr[ied] to be slick and [threw] him on the floor." [Doc. 97-3 at 2]. The video contradicts this claim.

to apply restraints to Plaintiff's legs.[13] [Video 1Fk; Doc. 91-2 (reflecting that Defendant Emig put leg restraints on Plaintiff while he was secured on the ground)]. Plaintiff was on the ground for approximately one minute altogether. [Id.]. Eventually, Defendants Carroll and Delozier assisted in bringing Plaintiff back to his feet. [Video 1Fi, 1Fk; Doc. 89-16 at ¶ 8; Doc. 91-2 at 1-2].

Once on his feet, Plaintiff's pants were around his ankles. [Video 1Fk]. Defendants Carroll, Delozier, and Campbell walked Plaintiff to the shower, briefly holding him against an adjacent wall, while other officers opened the shower door. [Id.; Doc. 89-16 at ¶ 8; Doc. 91-2 at 1-2]. The officers walked Plaintiff inside the shower. After the officers stepped out of the shower and closed the door, Plaintiff submitted to the removal of restraints through the small opening in the door and the shower was turned on. [Id.; Doc. 89-16 at ¶ 8]. None of the officers involved in the September 27 incident had any feelings of ill-will towards the Plaintiff or wanted to harm him. [Doc. 89-13 at ¶ 14; Doc. 89-14 at ¶ 14; Doc. 89-15 at ¶ 14; Doc. 89-16 at ¶ 11; Doc. 89-17 at ¶ 17; Doc. 89-19 at ¶ 13]. Plaintiff does not present a competing forecast in this regard.

Later that morning, Plaintiff was examined by medical staff. He reported pain in his right wrist from "punching the walls" during a cell extraction. [Doc. 91-5 at 57]. The nurse reported that Plaintiff had "[n]o obvious injury" other than "a small abrasion from resisting restraints." [Id.]. An x-ray was ordered. [Id. at 61].

Plaintiff declared a hunger strike later that day or the next day. [Doc. 97-3 at 3; Doc. 91-5 at 56]. As a result of his hunger strike, Plaintiff was placed on close observation protocols. [Doc. 89-19 at ¶ 8]. He reported to mental health staff that he was hunger striking because he had been

[13] Plaintiff, on the other hand and contrary to the video evidence, claims that once he fell Defendants Campbell and Carroll "started gang assaulting [him]," punching him, and possibly kicking him. [Doc. 97-3 at 3]. Plaintiff claims he saw Defendant Carroll "swinging" and that Defendant Emig "later joined in." Plaintiff alleges that he "wasn't being aggressive at all." [Doc. 97-3 at 3]. While Plaintiff may have not been acting aggressively at that moment, Plaintiff's remaining claims about these Defendants' conduct are untrue.

"behind a door" for 21 months and wanted to be transferred. [Doc. 91-5 at 56, 76]. Plaintiff saw medical staff for a hunger strike assessment on October 1, 2023. Plaintiff reported that he was not going to eat and that he wanted to be sent to the hospital for an assessment. Medical staff advised Plaintiff that outside assessment is not protocol and that he needed to be seen by medical and have his vital signs taken. [Doc. 91-5 at 54].

Plaintiff was also seen by mental health staff the same day. [Id. at 75]. Plaintiff was noted to be irritable and uncooperative with impaired judgment and insight. Mental health staff encouraged the Plaintiff to work with staff appropriately to meet his needs, rather than attempting to force a transfer through hunger striking. Mental health staff concluded that Plaintiff's refusal to eat appeared volitional and not due to any psychotic process. [Id.].

On October 2, 2023, medical staff reported that Plaintiff refused to be seen for a hunger strike assessment. He declined water, food, and glucose tablets at that time. [Id. at 50-51]. Plaintiff was educated on how to get medical help if needed and encouraged to break his hunger strike. [Id. at 51]. The medical record also shows that Plaintiff refused the x-ray scheduled for his right wrist and forearm the same day. [Id. at 83].

**B. October 3, 2023 Incident**

On October 3, 2023, at approximately 8:30 a.m., Defendants Allen, Franklin, Franks, Campbell, and Emig escorted Plaintiff to medical for an evaluation related to his hunger strike. [Doc. 89-19 at ¶ 8; Doc. 97-3 at 3; Doc. 91-3 at 1]. Plaintiff refused to be evaluated and was taken to a cell for close observation. [Id.; Doc. 91-3 at 1; see Doc. 91-5 at 48]. Defendants' evidence shows that Plaintiff refused to comply with the removal of his restraints and was consequently placed on a Property Removal/Disruptive Inmate hold. [Id.; Doc. 97-3 at 3; Doc. 91-3 at 1]. Plaintiff, on the other hand, avers that he did comply and that "they" only "act[ed]" like he did not.

[Doc. 97-3 at 3]. In any event, "[t]hey" came back to Plaintiff's cell to bring him to the shower where he would be searched pursuant to this hold. [Videos 1Ha, 1Hb; Doc. 97-3 at 3]. Two officers slowly walked the Plaintiff, who leaned forward as he walked, to the shower and placed him inside. [Id.].

Once Plaintiff's restraints were removed, he initially laid down on the shower floor, refusing to comply with search protocol. [Doc. 89-19 at ¶ 8; Videos 1Ha, 1Hb]. When he stood up, Plaintiff removed his shirt, pants, an Ace bandage that was wrapped around his hand, and his underwear, passing the items to officers outside the shower. [Videos 1Ha, 1Hb]. Plaintiff can then be seen squatting multiple times and lifting his arms above his head. An officer then returned Plaintiff's clothes to him. [Id.].

Plaintiff put his shirt and underwear on and sat down in the shower. [Id.]. Plaintiff avers that he sat down because he was feeling ill for not having eaten for six days. [Doc. 97-3 at 3]. Several officers appear to be interacting with the Plaintiff, who remained on the floor for approximately nine minutes. [Videos 1Ha, 1Hb]. While on the floor, Plaintiff refused to comply with numerous commands and became unresponsive. [Doc. 89-19 at ¶ 9; Doc. 91-3]. A Code Blue was called to extract the Plaintiff from the shower. [Id.]. Several more officers arrived to the Red Unit shower. [Videos 1Ha, 1Hb]. One officer opened the shower door, and several walked inside, including Defendants Emig, Campbell, Allen, and Franks. [Doc. 89-19 at ¶ 9; Video 1Hb; Doc. 91-3 at 14]. Franks was first to make entry with the shield. [Doc. 91-3 at 14].

Defendants contend that once staff made entry into the shower Plaintiff quickly became assaultive, striking Defendant Campbell with a closed fist and attempting to bite Defendant Allen's hands.[14] [Doc. 89-19 at ¶ 9; Doc. 89-17 at ¶ 9; Doc. 89-18 at ¶ 9; Doc. 91-3 at 1, 12, 15]. Given

---

[14] During this time, Officer Joshua Neal, who was charged with filming the Code Blue shower extraction with a handheld camera, notified the Sergeant that the camera was not functioning. [Doc. 91-3 at 1, 16].

Plaintiff's aggression and assaultive behaviors, the shield became a hinderance, so Defendant Franks stepped out of the way so remaining staff could gain compliance. [Doc. 91-3 at 14]. Defendants show that, in response to Plaintiff's assaultive behavior, Defendant Emig tasered Plaintiff, causing Plaintiff to abandon all resistance. [Doc. 89-19 at ¶ 10; Doc. 91-3 at 1].

Plaintiff, on the other hand, avers that after a code was called "they" entered the shower and started to tase and assault the Plaintiff, even though he "wasn't being aggressive at all." [Doc. 97-3 at 3]. Plaintiff specifically denies assaulting Defendant Campbell but does not deny attempting to bite Defendant Allen. [Id. at 4]. After the exchange, Plaintiff was placed in full restraints, and two officers lifted him from the floor and walked him out of the shower. [Doc. 89-19 at ¶ 10; Videos 1Ha, 1Hb].

Medical staff, who had arrived in the meantime, checked Plaintiff's restraints. It appears that Plaintiff's restraints were adjusted in response to the medical check. [Id.]. After Plaintiff's wrist restraints were adjusted, medical staff again checked Plaintiff's restraints. [Id.; see Doc. 91-5 at 49]. The officers then carefully walked Plaintiff back to his cell, where he was left in restraints. [Id.]. Defendants' forecast of evidence shows that none of the officers involved in the October 3 incident had any feelings of ill-will toward the Plaintiff or wanted to harm him. [Doc. 89-17 at ¶ 17; Doc. 89-18 at ¶ 13; Doc. 89-19 at ¶ 13; Doc. 89-20 at ¶ 12; Doc. 89-21 at ¶ 13]. Plaintiff does not present a competing forecast in this regard.

---

Despite attempts to get the camera to turn back on, it failed to work. [Doc. 91-3 at 1, 16]. According to video footage from one of the fixed cameras in the Unit, it appears that an officer, presumably Neal, is handed a camera as officers assembled for the Code Blue. [Video 1Hb]. Neal appeared to test the camera at this time. Neal stood outside the shower with the camera in his hand and appeared to aim it at the shower at around 8:59 a.m. After about a minute and a half, Neal stepped back as some officers moved into the space outside the shower where he had been standing. Neal does not appear to have been filming at this point. At 9:01:44 a.m., Neal handed the handheld camera to another officer, who walked out of the Unit with it. Officers walked Plaintiff out of the shower at 9:03:22 a.m. [Id.]. Regardless, there is no handheld camera footage from this incident before the Court now. Nor was such footage the subject of a motion to compel.

At approximately 1:00 p.m. that afternoon, medical staff visited Plaintiff for a restraint check and hunger strike assessment. [Doc. 91-5 at 47]. Plaintiff refused food and a hunger strike assessment at this time. [Id.]. By about 8:30 p.m. that evening, Plaintiff was fully removed from restraints. [Id. at 46].

As a result of the incident in the shower, Plaintiff was charged with and later found guilty of infractions for assault on an officer and disobeying orders. [Doc. 97-3 at 6; Doc. 91-4 at 28; Doc. 89-4 at 1]. Plaintiff was placed in "ICON" for six months. [Id.].

### C. October 6, 2023 Incident

By October 4, 2023, Plaintiff was on day six of his hunger strike. [Doc. 91-5 at 42]. Medical staff visited him at his cell door. He requested to have his blood sugar, weight, and labs checked. Medical staff instructed custody staff to bring him to main medical. Once Plaintiff was moved, however, he refused the requested assessments. Plaintiff also refused food and glucose tablets. He was encouraged to break his hunger strike. [Id.]. Plaintiff also refused a hunger strike assessment on October 5.[15] [See id. at 37-41].

By October 6, 2023, Plaintiff was on day eight of his hunger strike. [Video 1J]. He was feeling dizzy and weak in his cell that morning from not having eaten. [Doc. 97-3 at 4]. At 6:15 a.m. that morning, medical staff sought to perform a hunger strike assessment on the Plaintiff. [Doc. 91-5 at 35]. He refused. He also refused the offer of food. [Id.]. Because of Plaintiff's repeated refusals to be medically examined (and to submit to restraints therefore), a cell extraction team was approved and assembled to remove him from his cell for a medical assessment. [Doc. 91-4 at 1, 22-25; Video 1J]. The team consisted of Sergeant Jeremy Sams and Defendants Green,

---

[15] Although a record for a Self-Injurious Behavior encounter timed at 10:00 a.m. reports that a hunger strike assessment was "completed," there are no relevant findings reported. [Doc. 91-5 at 40-41]. A Clinical Encounter Report from later that morning, on the other hand, reflects that Plaintiff refused to come out of his cell to be properly assessed for his "refusal of nourishment." [Id. at 37].

Delozier, Campbell, Lay, Torres, and Herald. [Video 1J; Doc. 89-17 at ¶ 11; Doc. 89-22 at ¶ 8; Doc. 89-23 at ¶ 8; Doc. 89-26 at ¶ 12; Doc. 89-24 at ¶ 8; Doc. 91-4 at 32]. Defendant Herald was responsible for video recording the extraction. [Id.].

As the extraction team assembled and voiced their duties on the video recording, it was reported that Plaintiff was kicking his cell door and banging his head against the cell window. As a result, Darren Daves, Correctional Caption and Officer-in-Charge, authorized the use of taser and OC pepper spray during the extraction. [Id.].

The team made its way to Plaintiff's cell in Red Unit. [Id.]. When they arrived, Captain Daves ordered Plaintiff to come to the cell door and to submit to restraints. No response is audible on the video and Captain Daves noted Plaintiff's refusal to comply. Sergeant Jeremy Sams reiterated the order to submit to restraints and warned Plaintiff that he would be subject to the use of an electronic control device if he failed to comply. Then the shield officer, Defendant Green, demonstrated the electric element of the taser shield for the Plaintiff. Sergeant Sams again commanded Plaintiff to step to the door and put his hands in the trap to submit to restraints. Plaintiff failed to submit as ordered. Sergeant Sams then directed Defendant Lay to administer OC pepper spray, which Lay did through the trap door for approximately two seconds. The team members lined up as Defendant Herald moved to Plaintiff's cell door to video record the Plaintiff before the team entered the cell. [Id.].

When Defendant Herald arrived at Plaintiff's cell door with the video camera, Plaintiff was seated on his bed, which appeared to have some reddish-orange substance spilled on it. He was dressed and had a blanket on his lap. [Id.]. After more than two minutes passed, Sergeant Sams approached the window and commanded Plaintiff to come to the cell door and place his hands for submission to restraints and asked, "Will you comply?" No response by the Plaintiff is audible.

Sergeant Sams again ordered Plaintiff to comply with restraints. After Plaintiff made no movement to comply, Sergeant Sams directed Defendant Lay to administer another burst of OC pepper spray, which Lay did. At this time, Plaintiff remained on his bed. After allowing over a minute to pass, Sergeant Sams again ordered Plaintiff to submit to restraints and warned Plaintiff that the extraction team would enter his cell if he did not comply. [Id.]

Plaintiff remained seated on his bed as the extraction team readied to enter his cell. Defendant Green, holding the taser shield, was the first to enter followed directly by Defendants Delozier, Campbell, Lay, and Torres. Defendant Green applied the taser shield to the Plaintiff as the other officers sought to secure him. Plaintiff struggled and resisted under the shield and was repeatedly ordered to stop resisting and to give his hands to be secured. [Id.]. Plaintiff avers that Defendant Green tased him "for no reason … while [Plaintiff] was getting punched in the head and face" and that Plaintiff "saw [Defendant] Delozier punching [him]." [Doc. 97-3 at 4]. While the footage shows Defendant Delozier physically struggling to gain Plaintiff's compliance, it does not show Defendant Delozier punching the Plaintiff, nor does it show that Defendant Delozier even had sufficient physical space to wind up and punch the Plaintiff. That is, Defendants, once inside the cell, were huddled together very closely around the Plaintiff and Defendant Delozier was up against the right wall. The view of Defendant Delozier, however, is partially obscured by Defendant Campbell. [Video 1J]. As such, though less probable thereby, Plaintiff's claim that Delozier punched him is not directly refuted by the video evidence.

Within under a minute, the team restrained and secured Plaintiff's hands and legs. Defendants Lay and Torres backed away. [Video 1J]. Defendants Delozier and Campbell lifted Plaintiff to his feet while Defendant Green covered with the shield. As the extraction team sought to escort Plaintiff to the decontamination shower, Plaintiff's pants were falling down, causing

Plaintiff to step on them and have difficulty walking. After Plaintiff's pants and ankle restraint were adjusted, he was brought to the shower. [Id.].

Once Plaintiff was locked in the shower, he began cursing and spewing obscene comments and insults at the extraction team. Sergeant Sams nonetheless calmly directed Plaintiff to face the wall so that his leg restraints could be removed so that Plaintiff could take a decontamination shower. Plaintiff refused, saying "Good. I don't need no shower. I got clothes on. What's the next step?" Sergeant Sams repeated his command to face the wall so that Plaintiff's restraints could be removed for a shower. Plaintiff finally turned toward the wall as he looked over his right shoulder toward the shower door. Defendants Green, Delozier, and Lay calmly entered the shower and removed Plaintiff's leg restraints. These Defendants backed out of the shower and Sergeant Sams locked the door. [Id.].

Plaintiff then complied with Sergeant Sams's instructions to place his hands through the trap to have his wrist restraints removed. After Defendant Delozier removed his wrist restraints, Plaintiff persisted in cursing and uttering obscenities and derogatory comments at the Defendants. Plaintiff then repeatedly refused to take a shower, yelling, among other things, "You can't make me take a shower. You f**king stupid.... You can't do that. You can't make me do s**t. Leave me the f**k alone.... F**k you," all while gesticulating angrily. [Id.]. On Plaintiff's refusal to take a decontamination shower, Sergeant Sams directed the extraction team to reenter the shower to re-restrain the Plaintiff for escort to medical.[16] [Id.; Doc. 91-4 at 8].

The video shows that Defendant Green entered first with the shield, followed by Defendants Delozier, Campbell, Lay, and Torres. As the team entered the shower, Plaintiff put

[16] In the Incident Report, Warden R.L. Huneycutt notes Sergeant Sams's failure to order Plaintiff to submit to restraints before ordering the team to reenter the shower but also recognizes that "the inmate is clearly verbalizing he is not going to cooperate with any order." [Doc. 91-4 at 8-9].

his hands out toward these Defendants. Using the shield, the team put Plaintiff against the floor and worked to secure his hands and feet. [Video 1J]. From the audio element of the video footage, it appears the taser aspect of the shield was employed for approximately nine seconds. Plaintiff was restrained with relatively minimal disturbance. [Id.]. Plaintiff avers that "they" entered the shower and assaulted and tased him at the same time "for no reason" until he "fell and hit [his] head on the floor inside the shower." [Doc. 97-3 at 5]. While Defendant Green did use the taser shield on the Plaintiff, the video does not reflect any assault by the extraction team other than that incident to restraining a recalcitrant inmate or that Plaintiff fell inside the shower. [See Video 1J].

The team secured Plaintiff in approximately one minute. Defendants Lay and Torres backed away. Defendants Delozier and Campbell stood Plaintiff up and escorted Plaintiff out of the shower while Defendant Green covered with the shield. Plaintiff continued to utter expletives and nonsensical commentary. He became resistive and started struggling, but the team was able to quickly regain compliance and proceed with the escort to medical.[17] Plaintiff's commentary and expletives continued. [Video 1J].

Once in medical, the team secured the Plaintiff onto an exam table. A medical staff member then asked the Plaintiff whether the staff member could perform vital signs or test Plaintiff's blood sugar. Plaintiff refused. The staff member also asked whether Plaintiff would provide blood or urine for testing. Plaintiff also refused this request. When asked whether he wanted to give a reason for his hunger strike or if there was anything medical could do to help him, he did not respond. Plaintiff appeared to deny suicidal ideation. He indicated that he was not drinking water or urinating. Medical offered him glucose tablets, which he refused. Plaintiff also refused a physical examination. [Id.; Doc. 91-5 at 32-33].

---

[17] Plaintiff avers that the team "then rushed [him] to the nurse." [Doc. 97-3 at 5]. While the team did take Plaintiff to medical, they proceeded with all usual speed. [Video 1J].

After voicing concerns over Plaintiff's health and safety due to his hunger strike and given Plaintiff's refusal to accept treatment, medical staff recommended that Plaintiff be transported to an outside hospital emergency room for evaluation. Plaintiff agreed to be transported. [Video 1J; Doc. 91-5 at 32]. Plaintiff was then wheeled to inmate receiving for transport to the hospital without incident. Approximately 20 minutes elapsed between the extraction team's arrival at Plaintiff's cell and his agreement to transport to an outside hospital. Defendant Herald recorded this event in its entirety. He was not involved in any use of force. [Video 1J]. None of the Defendants involved in the October 6, 2023 cell extraction participated or used force in retaliation or held any feelings of ill will toward the Plaintiff or ever wanted to harm him. [Doc. 89-17 at ¶¶ 5, 17; Doc. 89-22 at ¶¶ 5, 12; Doc. 89-23 at ¶¶ 5, 12; Doc. 89-24 at ¶¶ 5, 12; Doc. 89-25 at ¶¶ 5-12; Doc. 89-26 at ¶¶ 5, 18].

While in inmate receiving waiting to be transported to the hospital, Plaintiff complained of and was treated for a cut on his wrist from handcuffs. [Doc. 91-5 at 31]. At the outside hospital, Plaintiff reported to the provider that he was hunger striking to be moved to Central Prison for psychiatric reasons. [Doc. 91-5 at 77]. Plaintiff reported that he has paranoid schizophrenia and depression and believes he should be in a psychiatric care environment. [Doc. 91-5 at 77]. Plaintiff reported that he "would rather be dead than stay at his current prison." [Doc. 91-5 at 77].

On physical examination, the outside provider noted that the Plaintiff appeared "well" with "even and unlabored" respirations, and no swelling of any extremities. [Doc. 91-5 at 77]. The provider noted Plaintiff's chief complaint as weakness and noted differential diagnoses of suicidal ideation, malingering, and psychosis. [Doc. 91-5 at 77-78]. Plaintiff asked the provider if he could have some food, but when he learned it would end his hunger strike status, decided not to eat anything. [Doc. 91-5 at 77]. The provider instructed that Plaintiff should be placed on suicide

precautions on return to prison and recommended that consideration be given to his transfer to Central Prison. [Doc. 91-5 at 78; Doc. 91-5 at 72]. Plaintiff returned to Alexander that night. [See Doc. 91-5 at 27-28].

Plaintiff continued his hunger strike and refusal to be assessed until at least October 12, 2023, when he was transferred to Tabor Correctional Institution. [Doc. 97-3 at 5; Doc. 91-5 at 7-15, 18-19, 23-26]. Throughout the events on September 27, October 3, and October 6, 2023, Plaintiff refused to comply with numerous orders aimed at ensuring prison safety and security. [Doc. 89-13 at ¶ 12; Doc. 89-14 at ¶ 12; Doc. 89-19 at ¶ 11]. Defendants contend that all force applied was in direct response to Plaintiff's resistance and non-compliance. [Doc. 89-13 at ¶ 13; Doc. 89-14 at ¶ 12; Doc. 89-16 at ¶ 10; Doc. 89-19 at ¶ 12; Videos]. Moreover, the reviewing authorities for each incident determined that Defendants used only the minimal amount of force necessary to achieve correctional objectives and prevent staff assault. [Doc. 91-2 at 4-6; Doc. 91-3 at 5-7; Doc. 91-4 at 6-7].

## IV. DISCUSSION

### A. Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component – that the harm inflicted was sufficiently serious – and a subjective component – that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

This subjective standard requires proof of malicious or sadistic action by a prison official to make out an excessive force claim. This is because prison "[o]fficials are entitled to use

appropriate force to quell prison disturbances." Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous standard." Id. (citing Whitley, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm." Id. (internal quotations and citation omitted).

In considering the subjective component, the Court is to consider: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. Whitley, 475 U.S. at 321; Hudson v. McMillian, 503 U.S. 1, 7 (1992).

Although "significant injury" is not required to state an excessive force claim, the absence of injury is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (internal quotations and citation omitted). "The extent of injury may also provide some indication of the amount of force applied." Id. Not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (some internal quotation marks omitted). "An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 559 U.S. at 38 (internal quotation marks omitted).

Moreover, "[c]orrectional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'" Shiheed v. Harding, 802 Fed. App'x 765, 767 (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019) (internal quotation marks omitted)). "'And we owe officers wide-ranging deference in their determinations that force is required to induce compliance with policies important to institutional security.'" Id. (quoting Brooks, 924 F.3d at 113 (internal quotation marks omitted)). "[T]he evidence must go[ ] beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." Whitley, 475 U.S. at 322. Ultimately, if the court cannot find that "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the [two-part] standard," the defendants are entitled to summary judgment on an excessive force claim. Id.

**A. September 27, 2023 Incident**

The forecast of evidence for the September 27 incident shows that Plaintiff repeatedly and persistently defied orders and physically resisted Defendants Sculley and Walsh as they escorted him to Red Unit. Specifically, relative to Defendant Sculley's use of pepper spray directed at the Plaintiff in his cell, the acceptable forecast shows, at best, that Plaintiff had just surreptitiously taken his previously confiscated tablet from Defendant Walsh's office to his cell, was refusing orders to exit his cell to be restrained and taken to Red Unit, and had 26 infractions since August 2017, including nine for disobeying orders and six for fighting or threatening to harm staff. At worst, the forecast also shows that Plaintiff began cursing, threatening Defendants Sculley, Walsh, and Jamison-Lafond, and aggressively posturing in response to multiple orders to exit his cell before Defendant Sculley employed pepper spray.

In either case, no reasonable jury could conclude that the minimal and measured use of pepper spray by Defendant Sculley to compel Plaintiff's compliance with orders was done maliciously and sadistically for the very purpose of causing harm. Williams, 77 F.3d at 761. Rather, a reasonable jury would conclude that the amount of force was proportional to the need for the use of force, that Plaintiff's persistent refusal to comply with orders to exit his cell warranted the use of this limited use of force to effect a correctional objective and compel compliance, and that no unnecessary force was applied to cause Plaintiff to exit his cell and submit to restraints.

As for the remainder of the escort to Red Unit, there is no genuine issue of material fact regarding any use of force. As set out above, all material aspects of Plaintiff's forecast of this incident are refuted by the video evidence. Furthermore, the forecast of evidence shows no involvement by Defendant Jamison-Lafond in any use of force.

Because there is no genuine issue for trial as to the September 27 use of force, the Court will grant summary judgment to Defendants Walsh, Sculley, Jamison-Lafond, Carroll, Campbell, and Emig on this claim. Moreover, because the forecast of evidence does not support that a constitutional right was violated as to this use of force, these Defendants would also be protected by qualified immunity on this claim. See E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

**B. October 3, 2023 Incident**

The forecast of evidence for the October 3 incident shows that Plaintiff had been on a hunger strike for approximately five days and had refused assessments of his condition that morning and the day before. The forecast further shows that Plaintiff was placed on a Property Removal/Disruptive Inmate hold for his perceived refusal to comply with the removal of his

restraints after refusing a hunger strike assessment that morning. The forecast shows that Plaintiff was placed inside the shower where he initially refused to comply with search protocol. The forecast shows that after Plaintiff participated in the search protocol he sat on the floor of the shower for several minutes, where he refused numerous commands and became unresponsive to officers. The forecast shows that a Code Blue was called to extract Plaintiff from the shower.

The forecast further shows that Defendants Franks, Emig, Campbell, and Allen entered the shower to extract the Plaintiff. The forecast shows that Plaintiff became assaultive and attempted to bite Defendant Allen. While Defendants' forecast also shows that Plaintiff struck Defendant Campbell with a closed fist, Plaintiff's forecast refutes this. The forecast shows that Defendant Emig tasered the Plaintiff in response to Plaintiff's assaultive behavior, causing Plaintiff to abandon his resistance. While Plaintiff contends that he "wasn't being aggressive at all," the acceptable forecast in that he attempted to bite Defendant Allen plainly undermines this claim. Additionally, Plaintiff's vague claim that "they" started to "assault" him when they entered the shower in the face of the acceptable forecast of evidence is insufficient to withstand summary judgment. Moreover, the forecast of evidence shows that Plaintiff was placed in full restraints after the incident, later found guilty of infractions for disobeying orders and assaulting staff, and placed in restrictive housing for six months because of the incident.

From this forecast, no reasonable jury could conclude that Defendant Emig's use of a taser to gain control of the recalcitrant and combative Plaintiff was done maliciously and sadistically for the very purpose of causing harm. Williams, 77 F.3d at 761. Rather, a reasonable jury could conclude that Defendant Emig reacted to Plaintiff's assaultive behavior and employed his taser to quell a prison disturbance and prevent further staff assault. See id. Furthermore, no reasonable jury could conclude from the acceptable forecast of evidence that any other Defendant who entered

the shower that day to extract the Plaintiff acted maliciously and sadistically to cause Plaintiff harm.

Because there is no genuine issue for trial as to the October 3 use of force, the Court will grant summary judgment to Defendants Franklin, Campbell, Allen, Franks, and Emig on this claim. Moreover, because the forecast of evidence does not support that a constitutional right was violated as to this use of force, these Defendants would also be protected by qualified immunity. See Dolgos, 884 F.3d at 178.

**C. October 6, 2023 Incident**

The forecast of evidence for the October 6 incident shows that Plaintiff had been on a hunger strike for approximately eight days and had refused assessments of his condition since October 2. The forecast shows that, given Plaintiff's protracted refusal to be assessed relative to his hunger strike, a cell extraction team was approved and assembled. The forecast shows that Plaintiff refused numerous orders over several minutes to come to his cell door and submit to restraints to be taken to medical. The forecast shows that Sergeant Sams warned Plaintiff he would be subject to the taser shield, which Defendant Green demonstrated, if Plaintiff failed to comply and that Plaintiff nonetheless persisted in his refusals. The forecast shows that Defendant Lay administered two short bursts of pepper spray into Plaintiff's cell on Sergeant Sams's order before entry of the extraction team. The forecast shows that, despite the repeated commands, the demonstration of the taser shield, warnings that the extraction team would enter his cell and that the taser shield would be used if Plaintiff did not exit, and the use of pepper spray, Plaintiff continued to refuse to exit the cell. The forecast shows that, once the extraction team finally entered Plaintiff's cell, Defendant Green applied the taser shield to the Plaintiff, as Plaintiff had been warned would happen, and that Defendants Delozier, Campbell, Lay, and Torres worked to

secure the Plaintiff's hands and feet as Plaintiff struggled and resisted the application of restraints. While Plaintiff claims that Defendant Delozier "punch[ed]" him during this extraction, there is no forecast of evidence of any injury from this alleged use of force or from the use of pepper spray during the extraction. Rather, the forecast shows that an outside provider who examined the Plaintiff shortly after the incident described him as "well" and noted no injuries or any complaints of injury by the Plaintiff. The forecast further shows that, other than for a cut on his wrist from restraints, Plaintiff never sought treatment for any injuries from the October 6 cell extraction.

From this forecast, no reasonable jury could conclude that any force used by Defendants Green, Delozier, Campbell, Lay or Torres in conducting the cell extraction was done maliciously or sadistically for the purpose of causing harm. Rather, a reasonable jury would conclude that the forced used by Green with the taser shield and by Lay through the pepper spray were reasonable, measured, and appropriate under all circumstances.

Additionally, Plaintiff has not shown that he suffered any injury from the minimal use of pepper spray, which is supported by Plaintiff's refusal to take a decontamination shower, or from Defendant Delozier allegedly punching him. While serious injury is not required to make out an excessive force claim, the lack of any injury remains relevant, especially when coupled with a tenuous and very thin forecast of a punch amid the concerted effort to quell Plaintiff's resistance and restrain him after his protracted defiance of orders. Here, the forecast against Defendant Delozier is akin to the push or shove causing no discernible injury, not reflecting a malicious and sadistic use of force for the purpose of causing harm. See Wilkins, 559 U.S. at 38; Williams, 77 F.3d at 761. No reasonable jury would find otherwise. See Whitley, 475 U.S. at 322 (finding a case should not go to the jury where evidence did not "support a reliable inference of wantonness in the infliction of pain"). Finally, as to the cell extraction, a reasonable jury would also find that

any minimal force used by Defendants Campbell and Lay was incident and necessary to the cell extraction at issue.

The Court next turns to the extraction team's entry into the shower to restrain the Plaintiff to escort him to medical after he refused to take a decontamination shower. The forecast of evidence shows that once Plaintiff was locked in the shower, he continuously spewed insults and obscenities at the extraction team, that he initially refused to have his restraints removed, that once his restraints were removed, he refused to take a decontamination shower, and that Sergeant Sams directed the extraction team to reenter the shower to re-restrain Plaintiff to take him to medical for an assessment. The forecast shows Plaintiff clearly verbalizing his refusal to cooperate with any order. The forecast shows that as Defendants Green, Delozier, Campbell, Lay, and Torres entered the shower, Plaintiff put his hands out towards these Defendants and that Defendants put Plaintiff against the floor and restrained him with relatively minimal disturbance. Plaintiff claims that "they" assaulted and tased him "for no reason" until he fell and hit his head inside the shower. While, as noted, the forecast shows that Defendant Green used the taser shield to secure the Plaintiff against the ground, the video does not show any "assault" by the extraction team other than the measured use of force incident to restraining a recalcitrant inmate. Furthermore, the video does not show Plaintiff falling inside the shower or hitting his head.

From this forecast, no reasonable jury could conclude that any force used when the extraction team reentered the shower on October 6 was done maliciously and sadistically for the very purpose of causing harm. Williams, 77 F.3d at 761. Rather, a reasonable jury may conclude that Defendants, who were faced with a persistently recalcitrant, verbally assaultive, and resistive inmate, acted on orders in reentering the shower to restrain the Plaintiff while disregarding the putative and potentially fleeting offer of his hands for restraint. While best practice may have been

to have again ordered the Plaintiff to submit to restraints before reentering the shower, despite the obvious futility of such an order, or to have attempted to apply restraints without securing Plaintiff to the floor, the video footage as a whole demonstrates that the extraction team, including Defendant Green, acted on Sergeant Sams's order for the sole purpose of compelling compliance and restoring order, not to cause Plaintiff harm. See Williams, 77 F.3d at 761. Again, no reasonable jury could conclude otherwise from the forecast of evidence. See id; Wilkins, 559 U.S. at 38.

Finally, there is no forecast of evidence that Defendant Herald participated in any use of force on the Plaintiff on October 6, 2023, or otherwise. That is, the forecast shows only that Defendant Herald operated the handheld camera that captured the incident.

Because there is no genuine issue for trial as to the October 6 use of force as to Defendants Green, Delozier, Campbell, Lay, Torres, and Herald, the Court will grant summary judgment to these Defendants on this claim. Moreover, because the forecast of evidence does not support that a constitutional right was violated as to this use of force, these Defendants would also be protected by qualified immunity. See Dolgos, 884 F.3d at 178.

**B. Retaliation**

An inmate has a clearly established First Amendment right to be free from retaliation for filing grievances. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 540 (4th Cir. 2017). Inmates also have a protected First Amendment right to complain to prison officials about prison conditions and improper treatment by prison employees that affect them. See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

In order to succeed on a retaliation claim under Section 1983, a plaintiff must show: (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely

affected his First Amendment rights, and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). The causation element requires that a plaintiff show that "the defendants were aware of the plaintiff's engaging in a protected activity and show some degree of temporal proximity to suggest a causal connection." Gowen v. Winfield, 130 F.4th 162, 173 (2025) (cleaned up).

From the forecast of evidence here, no reasonable juror could conclude that any adverse action by Defendants Green, Delozier, Campbell, Lay, Torres, or Herald was motivated by any protected conduct by the Plaintiff. That is, there is no forecast of evidence of any protected activity in the first instance or that any protected activity caused or motivated the October 6, 2023 cell extraction, let alone any alleged improper use of force relative thereto. Rather, the forecast of evidence shows that Plaintiff repeatedly and consistently refused to be medically assessed relative to his hunger strike and that the use of a cell extraction team to bring Plaintiff to medical was approved and executed for this purpose. Moreover, the forecast shows that none of these Defendants retaliated against Plaintiff for any reason or had any ill feelings toward him regarding the alleged, though unshown, grievance regarding the September 27, 2023 incident or otherwise. The Court, therefore, will also grant Defendants' motion as to Plaintiff's retaliation claim.

## V. DEFENDANTS' MOTION TO SEAL

Defendants move to seal certain records submitted in support of their summary judgment motion, including Plaintiff's Custody and Control History, the relevant Incident Reports and disciplinary record, Plaintiff's medical records, and the video footage. [Doc. 90]. Defendants argue that these documents contain records that are confidential under North Carolina law. [Id. at 1 (citing N.C. Gen. Stat. §§ 132-1.7(a)(3), 148-74, and 148-76)]. Defendants also argue these

records are necessary and proper to providing a full defense and that the failure to seal them would embarrass or reveal confidential information of the Plaintiff, risk prison security, and/or reveal confidential and protected NCDAC information. [Id. at 2].

Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000). In the present case, the public has been provided with adequate notice and an opportunity to object to the Defendants' motion. Defendants filed the motion on June 26, 2026, and it has been accessible through the Court's electronic case filing system since that time. Moreover, the public's right of access to the subject records is substantially outweighed by the competing interest in protecting the substance of such information, including the facility's interest in protecting security-related information and Plaintiff's interest in the privacy of his medical record. Having considered less drastic alternatives to sealing these Exhibits, the Court concludes that sealing these records is necessary to protect the implicated privacy interests. As such, the Court will grant Defendants' motion to seal and order that Docket Nos. 90-1 through 90-5 and Doc. 96 remain sealed.

## VI. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment and motion to seal.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 87] is **GRANTED**, and this action is hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal [Doc. 90] is **GRANTED** and Docket Nos. 90-1 through 90-5 and Doc. 96 shall remain sealed.

The Clerk is respectfully instructed to update the docket in this matter to reflect Defendant Greene's last name as "Green" and to terminate this action.

**IT IS SO ORDERED**.

Signed: October 1, 2026

Frank D. Whitney
Senior United States District Judge